Appellant, Ms. Wright v. Appellant Andre Davis, Mr. Kerlin v. Appellant Sherri Davis, and Ms. Robbins v. the Athlete. May it please the Court, Lisa Wright representing Mr. Andre Davis. I'd like to reserve two minutes for rebuttal. As to the sufficiency of the evidence, the evidence to trial established the falsity of only a fraction of the 2012 return. The government needed to prove beyond a reasonable doubt that Andre Davis was in on the fraudulent scheme, knew Sherri was filing false returns and not simply an unwitting participant in what he understood to be a legitimate tax prep business. First, as to his evidence of his knowledge generally, the fact that the ETHAN application was filed under his name is alone useless. There's no reason to think that Andre's intent was anything other than to participate in a legitimate business. Do you draw a distinction between count 1 and count 19 as to what the government must show as to your client's intent? Well I think that if they show that he knew that he was assisting in the Jaycox return, I think that's probably sufficient to show. Assisting? What about the district court's ruling in dismissing count 15? The district court said it's not enough that the government simply offered evidence that the person was sitting at the computer. That title 26 section, whatever it was, 762A requires more. Right, absolutely. Knowledge. That's the falsity. So with count 19, what's your argument about... Yeah, I don't think... I don't think you would know. I mean, you saw what the government said in its brief as to count 1. Reasonable inferences from the evidence are sufficient as to conspiracy. Which we disagree about because the general knowledge, the information they point to, if they can't establish that he actually knew about the Jaycox, the falsity of the Jaycox... That's count 19. I thought the government's argument that I was referring to had to do with count 1, conspiracy. Well he has to know that he's joining a fraudulent scheme, and if there's no evidence that he ever knew of any particular false document, since Jaycox is the only one they claim he equally consistent with participation in a legitimate tax prep business, and the jury can be left to only speculate by his state of mind whether he joined a conspiracy to violate the law, or whether he was just participating unwittingly. It's really that's the question. Well he knew the IRS was investigating his mother as of 2011, that it had withdrawn her authorization to file electronically. I don't think it's too clear what he knew about that. The government relies on the conversation with LaDonna for his knowledge. Well then he, or I suppose you would say someone on his behalf, asked for authorization for him to file electronically. Right. So his name was appearing on it. Right, but that's equally consistent. It doesn't tell us anything about whether he's witting or unwitting. So you think the only evidence the government has is mere presence? Yeah, essentially LaDonna, the LaDonna quote warning, which was nothing other than saying you know everything else that's going on. I don't think it's clear when you're saying that he knew his mother was being investigated. I think that the focus of LaDonna's testimony was that family members were blaming LaDonna, not Sherry, and that the problem they were upset about was that the taxpayers are getting audited, and it's LaDonna's fault. And yes, they know that their records about these returns have been seized, but I don't think it's clear at all that anyone knows that LaDonna is being charged criminally. Her indictment doesn't come down until, and her information isn't filed until September. The government is trying to flip her. So presumably the fact that they're talking to her about criminal charges is a secret at this point. I mean I don't think there's any reason to think Andre is really being warned of any criminal activity, and if he is, LaDonna, Sherry, LaDonna said that Sherry kept telling LaDonna that I, Sherry, didn't do anything wrong. Now LaDonna may have had information otherwise, but she did not tell Andre that. She didn't say, listen, here's what's been going on. She just said, you know, do you want to get involved in light of everything else that's going on? What's your argument on the knowledge with respect to the tax return count? Yeah, because there's no doubt that there was a false return filed. Correct. And there's testimony that he prepared the return. Well, there's testimony that a young man prepared the return, and of course, you know, he didn't identify him as the person. What he said was, you know, he made absolutely clear that he was, you know, this was based on the signature. Well, let's just assume, just, I know your argument about that it might not have been him, but let's just assume that it was him. Right. So there's testimony that there's a false return that he prepared the return. Then what's the, what's your argument as to Andre? Well, the testimony wasn't really that he, okay, that he prepared it. So it really does come down to the fact that the signature is on there, and LaDonna, first of all, LaDonna testified that, well, that they, it's not clear that because, okay, let me skip to what you're asking me. That essentially, even if he is the one that he's talking about preparing the return, Jaycox testified that all he did was initialize and put in that they both input information. And that LaDonna testified that these logins, these names on the return at the time, that what happened seems to be that the young man, Andre, is entering data, and then Sherry comes over and he, they sign it. It actually says, Jaycox made clear. And finalizes it. Yeah, finalizes it. Well, that's a critical word, isn't it here? And he actually says, who did you see putting information on the return? It was actually both of them. So we know that Sherry actually entered data onto the return, and that she did so after he had done the initial part of the return. So it is really pure speculation at what point these numbers go on. Mr. Jaycox was never asked, did not ever say who he discussed these numbers with, who came up with the valuation number. He said Andre did not. And then the jury acquitted her as to this return, right? It appears that the jury went on the name on the bottom of the return. And we know that that alone cannot be enough. The government's evidence, Mr. Jaycox, really left this sort of giant gap regarding which one, Andre, Sherry, or both of them, created or knew of the falsity of the donation. Now, they were both charged in count 19, as the court says. And it seems like the government was content to sort of leave that ambiguity. They have charged them both. We kind of got them both sort of ambiguously. We don't know who did it. But I think the government thinks that it's other evidence. You know, the E-Fin, the fees, the LaDonna conversation are somehow enough to, you know, take this, allow the jury to resolve this despite this ambiguity and not have to speculate whether you had intent. Now, as to Sherry, that's not whether that's true or not. But as to Andre, it turns out those other things add up to nothing. So all you're left with at the end is this just complete ambiguity, which the government left there. You know, they didn't even really try to establish which one of them, or Jay Cox was unable to say, which one of them created these numbers or even knew of these numbers. But he did say that they both went through, that Andre went through everything. He did say that. But, I mean, when she comes in and finalizes, I think we know how this works when you're in one of these... And he apparently gave it back to him to sign, right? Yeah, I think he was unclear who gave it back to him to sign even. It doesn't matter. It came back to him after this finalization and he then signed it. Jay Cox. Yeah. No, no. Andre. Oh, I don't think that's... Justice McCarran. Justice McCarran, is that correct? Well, no, I think he said he actually did them, the young man, and then Sherry would go back over there and finalize them. I do remember him sitting down and signing them. And then Sherry and I had a discussion after that. So as far as the record shows, Andre is off the scene. And the way these tax prep things work, there's like a running total. I mean, we all know how you change any number and instantly the bottom line changes. So it's not as if... And the tax-wise person and LaDonna both explained that once your name is on there as the prep, once you're logged in with your preparer ID, unless someone logs you out and changes it to them, it's going in under your name. So there's no reason to infer that the fact that his name is on there means that... I think Sherry framed him. Oh, I don't think she... I don't think she framed him. She sets it up on his name, he does, then she puts in the false information and knows if he filed under his name. Well, I think as LaDonna said, that what happens is he did... I'm not saying she framed him, but he did do the initial entry. Whether Sherry didn't realize, you know, that it was still under his login or whatever, but the point is it doesn't tell us one way or the other what information Mr. Davis ever really laid eyes on and at what point in time this information was put in. And as I said, I think, you know, the government believed that it had this sort of conspiracy evidence against him, so they didn't really... it didn't bother them that there was sort of a complete lack of... there's just a gap as to who created these numbers, who knew about these numbers. Did she, you know... and if he doesn't... he's not the one that's talking to Mr. Jaycox and she's just giving him this... possibly she said, these are the valuation numbers. He doesn't know they're not right, even under that scenario. There's just... we just don't know what happened. There's a complete gap. And, you know, I think we all know that the e-signature, since the timing is unclear, an e-signature loan cannot be enough to have non-reasonable data. But where we could all be convicted of things that our co-workers submit under our name, a doctor could, you know, be held responsible for a prescription or any circumstance like that, a judge approving CJA vouchers. I mean, if there... you can think of a million examples in today's world of how signatures... it's not like you can look at a handwritten signature and definitively link it to anyone. I want to talk about the insufficiency as long as the Court's interested, but I did want to say also that even if the government did manage to eke out a sufficient case here, that the... I want to look at a couple of quick... the insufficient... the closing argument that was so prejudicial that a couple of things I really want to point to are the... when the government said... they basically accused... implied that they knew that Mr. Davis had to file personally inaccurate returns. And there's no evidence of that. It was Sherry that was charged with personal returns. And they're implying that he committed a separate uncharged crime. They said in four months they made a staggering amount of money. It's really only $16,000, but... which is not illegal. The illegal part is preparing false returns. The illegal part is that they didn't accurately report the gross receipts that they were earning. That's just... that's a pretty outrageous statement to make in a closing argument in a case where there's been no evidence and suggestion that Mr. Davis ever filed a personally inaccurate return. And the government does not defend this statement in its brief or even address it. And also I want to mention the LaDonna conversation I think is grossly misrepresented in the closing argument to make it sound much more sinister and inaccurate. You say... they have her saying, you see the trouble I'm in. You see the criminal charges I'm facing. And that was the point I was making earlier. There's no evidence that anyone knows that LaDonna's making... facing criminal charges. And also his response that I know what I'm doing is quite a bit more sinister than what he really said, which is just showing faith in his mother's statement. Finally, it's a sentencing... Excuse me. When this closing argument was made, were there transcripts already available in the testimony? That I don't know. I doubt it. I don't think so. Normally that would not be the case. We normally have to order those when they're produced in connection with the appeal. As to the sentencing, at a minimum... Let me just ask you a question about the argument. Now, there was no objection to the initial closing argument. But your client's counsel did join one of co-counsel's objections to the rebuttal. And in Andre's counsel's closing argument, he didn't focus on these things that you are now focusing on. And while he said he was relying largely on co-counsel's objections, these points you're making were not addressed by Andre's counsel in his closing argument. And were these points raised in his motion for judgment notwithstanding verdict? I don't think in quite the way. But he did raise it. He raised a general MGA. But he didn't list all these things you have in your brief. Oh, you're talking about some closing argument errors? Yes. No. And we're acknowledging that... I understand. And what I'm getting at is that the district court seemed quite responsive to addressing co-counsel's concerns and gave special instructions to the jury on three of the four points that co-counsel raised. So, this is plain error where none of these things was brought to the district court's attention. I mean, it is unfortunate that no... No, but what I'm trying to understand is, given the plain error standard, even if the three factors weigh in your favor as to the seriousness of some of the comments during the closing argument, the burden is very heavy. And how do you surmount it? Well, I think we have to show that the error is clear. And it is clear because there's just no... Well, apparently it wasn't clear enough to counsel. Well... All right. So, it wasn't clear enough to argue in a motion for judgment. Well, that's the premise of plain error review. I understand. You know, and I don't... If that was what the court may have been asking towards the transfer question about that. But, I mean... All right. This is a factual statement. So, it's not... It's either true or it's false. And if it's false, it's clearly false. It affected his substantial rights. That's the standard. I meant to... Plain error standard. Error has to be clear. It has to affect your client's substantial rights. Yes. And the burden is on us on that. And how do you meet it? Well, because accusing someone... When the prosecutor is implying that he has information, and frankly, the fact that everyone... No one says anything. I mean, it actually makes it more likely that the jury must have thought, well, I guess that must be... Boy, he must know something. I don't think you can benefit from your... Well, maybe not. But I do think that... But what I'm trying to understand is, under the three factors that we consider, namely the closeness of the case, the centrality of the issue, and what mitigation was taken to address the errors. And here, all we have is the general instruction about arguments of counsel are not evidence. That's right. How would you write this paragraph in the opinion? Now, I'm curious about it. I mean, you're right there to say it is. Right. It's central to the issue because it goes to his intent and knowledge. If he's filing his own... If he's not reporting this, that suggests he thinks it's dirty money. And he's also committed another crime, an uncharged crime, and that he and Sherry are comparable, and that they're both making this money and not telling the arguments. I mean, it's deadly to any suggestion that he thinks this is a legitimate business if he's not reporting his income from it. So the centrality is clear, and I think the closeness of the case is obviously clear. We don't think they meant it at all. And I don't think it's a... The explosiveness of this allegation, and I mean, Maddox is a little different, but it does talk about when, you know, there's sort of a prosecutor sort of vouching for evidence for which there's just none, that... So why are... You're focusing on the part about the use of they to intimate that Andre had filed his own false tax returns, not the closing argument characterization of the conversation with Madonna? That is also... Those two together, I think, are the worst, and they obviously are cumulative, and I want to not be dropping any of our claims. I mean, the goodwill receipts also is, I think, quite damaging. I mean, I can talk about any of those things, but I was focusing on, I think, the most explosive is that the Madonna conversation, as I said, I think it's really, you know, quite different to say, you see the criminal charges I'm facing. That's what the government's saying. They warned him that there was a crime going on, potentially. I mean, if he had known that, I think, leading the jury to think that Andre proceeded, knowing the government thought a crime had been committed by a 2FT preparer, it really tips the scale, as opposed to just thinking, Madonna has gotten our clients into trouble, and now they're being audited, but mom says it's all going to go away. I think I know what I'm doing. The error that's playing in your view is the district court's failure to intervene at this point? I think it has been a factual misstatement. Right. Okay, so the opposing argument incorporates a factual misstatement of proper testimony. Neither the district judge nor defense counsel picks that up, but it's plain. It's plainly incorrect, and I guess I would point the court to... Well, it is unarguably incorrect. Right. The question is whether that would be plain to someone sitting in the courtroom. Well... Someone with a great interest in the matter, such as defense counsel, but beyond that, it's not a question of law. We're talking about whether they picked up on a mischaracterization of testimony offered some days before. Well, to be honest, I don't think it is unreasonable to think that the judge is very familiar with the indictment and understands perfectly well that only Sherry is charged with personal return, so if he heard that, if he caught it, granted it's a quick statement, but anyone that actually heard what the judge said would plainly be like, what? Sherry was the only one charged with that. But there was no evidence at all. That's more important. Right. It's not that Sherry was the only one charged with it. This could have been uncharged conduct. It's just that there was a mischaracterization of the part of the testimony. Well, it was creating something for which there was no testimony. I think Judge Hogan was very well paying close attention to what the evidence came in and knew well anybody who was in the courtroom would have known that there had been no evidence at all. There was quite a distinction between... So if he was very much aware of that, what happened? Well, it's a quick statement. That's all I can say. It's a quick statement. We don't know why the people in the courtroom, other than the participants, didn't say anything. When you say somebody's playing out, you're asking us now and going forward to hold the district judge to that standard of acuity. Well, I think it's an unusual case. Most cases are not close like this. Most misstatements aren't explosive like this. I mean, this is really an unusual situation. And it's also combined with all these other problems as well. The clear... You know, the altering really is shifting towards a much more sinister interpretation of LaDonna. Suggesting that Andre is involved in copying receipts is really... It's devastating because otherwise there's zero evidence that he has anything to do with receipts, valuations, donation numbers, any false anything. And to have his hands on these receipts that are being given out is devastating. All right. Did you want to finish up your argument? Well, I just wanted to say about the sentencing. I'm not going to go into detail, but I just wanted to say that at a minimum, he's entitled to remand for resentencing at a loss in restitution. And the number we would say is $21,287, which eliminates the three items of loss that defense counsel clearly objected to. One, and the most egregious, was the loss from Sherry's personal tax returns, which he was not charged with and were not part of the conspiracy. And these other two were the Thomas Williams and Debra Johnson losses, which were based on this unexplained preparer pattern, which no one ever explained and the judge had concerns about. And we don't – the critical thing was Agent Naeem said that we took the amount that was the inflated amount and we gave him credit for any actual donation. And the problem is, as to those two taxpayers, we don't know what the size of the donation was. And so – All right. And your last argument is – that's your last argument. Right. And just to be super clear about the conspiracy, if there is no – if there's no evidence of Count 19, if Count 19 is insufficient, then there's just absolutely no evidence of conspiracy. Because that's the only count that charges him with any knowledge of any falsity at all. All right. So the conspiracy falls with it. All right. Thank you. Thank you very much. Good morning, members of the court. I'm going to focus my elaboration points mostly on the Brady issue, but of course if I have time I'll deal with a variety of other issues as well, including the mistrial issue. The starting point with respect to the Brady issue, a couple things are clear. Sherry is not raising a sufficiency of the evidence argument. And obviously we don't have to meet that standard in prevailing on the Brady claim. The real issue is the third, the prejudice prong. And as this court said in Pasha, as reflected in the variety of the post-Brady Supreme Court cases, the focus is would an objective fact finder who had not previously determined guilty on a reasonable doubt, which means essentially ruling out the district judge, is there sufficient issues with respect to the untimely disclosure or the nondisclosure to raise a question that really raises significant issues that undermines the confidence in the verdict. And in this particular case, the answer, I believe, the answer is clearly yes in four critical respects, three of which the district judge got totally wrong, and this court has the opportunity under de novo review to reevaluate that. The first point is that the issue with respect to the Brady nondisclosure has to do with evidence that concerns the government's star witness. There is no doubt that the government, no matter how strong they think the other evidence is, without LaDonna's testimony, without her cooperation, this case is not brought, or at least it's not brought in any way with respect to how it was actually indicted. And I don't think there's any, there's no question about that. The government, both I believe in some post-trial motions for judgment of acquittal and the mid-trial motion for judgment of acquittal, emphasizes that when the court asks, what's the evidence of the conspiracy, the main focus is on LaDonna's testimony and LaDonna's involvement. So I don't think there's any question about that. Now the other three are wrong. The evidence that was at issue with respect to the Brady nondisclosure was critical evidence that was both new impeachment evidence and an entirely new avenue that was not heretofore brought up, and that is that the Brady statement was the acknowledgment that LaDonna knew that when she filed her 2006-2010 returns, she knew that she was preparing a false return with false defendants. That is different from the earlier statement that had been provided that said that she, and in that, and in the Brady statement, she says that, somewhat ambiguously, she says that Sherry prepared the first one, she prepared all the other ones. That's coupled with her express acknowledgment that she knew the information was false. Her earlier statement that had been turned over in discovery was that she herself personally had prepared her 2006-2010 returns, and they were accurate. This line of question concerning dependents. So at minimum, when the Brady information is finally disclosed after trial, there's now a whole new inconsistent statement that didn't exist before. So this entire line of questioning with respect to when LaDonna was on the stand, both on direct and on cross, is not brought up because there's no reason to. It's a fraud theory or falsehoods that aren't charged in the indictment, and there's no inconsistent statement yet. So the new information provides an additional avenue of substantial impeachment on an avenue that had not been pursued before, and it is, so that's number one with respect to impeachment. Number two, and this kind of dovetails because this is not exactly, but it's the same thing that happened in PASHA under different facts, and that is that the argument was made at the trial court, and we make it in our brief, that the evidence was also substantive evidence that could have been admitted at trial, had that statement been prepared, that LaDonna was the one who actually filed her 2006 return by herself. She had earlier stated that one time, and that then sets up the entirely different argument that was clearly preserved in the record and finally raised, that she had the knowledge to cook up her own independent tax fraud scheme. At that point, the judge totally sort of pooh-pahs, it's just merely cumulative. On the other point with respect, no, the impeachment is merely cumulative. On the substantive issue, the judge says, well, it's highly unlikely that she would testify, because that's the other argument, the third thing the judge got wrong, that Sherry's lawyers argued, that had we had this information, we would have pursued LaDonna more aggressively, we would have gotten it admitted into the evidence as substantive evidence, not just new impeachment. That's major stuff, and on top of that, that it would have come in in such a manner that would have also opened up the opportunity for Sherry to testify. Now, the judge basically said that. With this line of argument, as I understand this line of argument, is that you've been aware that LaDonna had falsified her own tax returns, and it would have set up a potential substantive defense to the effect that it wasn't Sherry, it was LaDonna. Yes. Who was orchestrating things, and then as to that, what do you do with the fact that the jury convicted Sherry on a number of counts after LaDonna left? All right. Here's the way I look at it. The first thing, Your Honor, is that, and I'm just going to read one line out of Hasha, with respect to the speculation as to what would have happened. It goes, we never would have known that the statement would have been favorable or unfavorable, but because the government had failed to comply with its Brady obligations, the uncertainty must be charged with the defendant's case. Here's the way that this goes down. Two arguments. The first, Your Honor, is that if the court accepts the fact that this sort of really eroded or undermined the confidence in the verdict with respect to Sherry's credibility and her role in the conspiracy, that knocks out the first half of the conspiracy. Because even though the government indicted with the normal language, you know, known and unknown, there is zero evidence in the record that there were any other co-conspirators. I have the sites if you wanted to dig them up with respect to the government arguing specifically that it's Sherry and LaDonna, that it's LaDonna and Andre. I mean, again, it's Sherry and Andre. With regard to the arguments the co-counsel has made, the first answer is that if the court reverses for insufficient evidence against Andre, then the second half of the conspiracy charge, the conspiracy charge, not the substantive counts necessarily, but the conspiracy charges fall away under the rule of consistency because they were tried together and if this court determines as a matter of law that there was insufficient evidence that Andre was involved in the conspiracy, there are not two co-conspirators anymore. So that knocks out the entire conspiracy charge. So your argument depends on our argument. No, no, no. That's the first part. The second part is, and I would say that even if, well, that's clearly, if you knock out Andre, that's a problem. So do you have an independent argument? Sure. Even if you don't rule on the insufficiency argument with respect to Andre, going back to the undermining the confidence in the outcome of the case, this is the government's star witness. This case really isn't as strong as the government claims it is. And consistent with PASHA, and I think it's one of the other cases, Holloman or whatever, it says that the spillover, you don't necessarily apply the spillover, but you can under the circumstances. This is a complicated, it's not the most super complex conspiracy charge that any of us have ever seen. I acknowledge that. But it's intricate in some ways and it focuses heavily on the credibility of LaDonna and the fact that if they now would have this information, again, I don't have to establish it beyond a reasonable doubt, but it raises, it erodes the confidence in the verdict, that maybe the jury would have think, and it's logical to think, that wait a minute, Sherry gets up there now and testifies, and that's their fault because they were the ones that caused the speculative problem, that it undermines everything that has happened. If there's evidence now, substantive evidence in the record, that LaDonna has the wherewithal to create her own fraud scheme, that sort of undermines her pillar as holding up the whole case. So I think that the confidence in the verdict is so eroded with respect to her credibility, even with respect to the counts that come after she leaves the conspiracy. And Judge Johnson, the other thing that I want to emphasize with regard to the weakness of the case that goes to the prejudice, there are three things that are really going on with this case. Now, I know that Judge Rogers went through it, you know, how specific it is as to some counts being involved, and I recognize that this is not a super weak case against Sherry, but nor is it as strong as the government suggests. The strongest evidence of that, Your Honor, is that the way they argued this case throughout the trial was that Sherry and Andre were guilty, and they were very problematic as a charitable term to use concerning how they tried to deal with the taxpayers. Their position before the jury was that the taxpayers were not culpable. Were not culpable. That it's okay to sign stuff under penalty of perjury if you're not reading it. They didn't even want to give the taxpayers immunity. It was a big fight. If you recall the transcripts there, Judge Hogan had to basically tell them, if these guys are going to assert the Fifth Amendment rights, they're not going to testify unless they get formal court-ordered immunity, which happened. So according to the government, non-culpable taxpayers. That's one of the reasons why they're so powerful with regard to their wrong statement about Andre in closing and their misstatement of the rebuttal. But after Rule 33 motion, after the jury has done its job and gone home, after Rule 33 motion, they totally changed their tune, and now they argue that the strength of the case against both defendants is enhanced because the taxpayers are co-conspirators, too, or are criminally culpable, too. I don't have the site. I could dig it up, but I'm running out of time. Judge, there's tons of case law, whether it's from Justice Scalia in the entrapment case, whatever. Inconsistent theories show a weakness in the case, and normally that hurts the defendant who sometimes likes to argue, I didn't do it or if I did it was entrapment. But the principle holds with regard to both parties, and their focus on a totally different theory to convince the judge not to rule for a new trial in the post-trial Rule 33 motion, which was totally contrary to how they argued the case before the jury, is the clearest signal from their own, out of their own mouth, that the strength of the case they presented to the jury, start to finish, is weak to some extent. And that funnels into why the confidence of the verdict, if Sherry's credibility is now called into further question, consistent with Washington, consistent with Brady, Bagley, all those cases. Ladonna's, I'm sorry, I'm sorry. If Ladonna's, thank you, if Ladonna's credibility is called into question in that manner, that to me is a clear extension of Tasha to cover this case throughout the whole thing. Now what's left also are some additional counts, substantive counts against Sherry. But once you throw out the conspiracy, no, no, no, no, because if you throw out the conspiracy against Andre, then everything has to go. But then the nature of how all of the evidence is evaluated, even the counts, the substantive counts afterwards, Sherry I think was acquitted of one of those. But in addition to that, you have a situation where Sherry would have been able to testify. That assertion was made at the trial, that with this different way of dealing with the case, she would have testified. Tasha says that, again, the uncertainty and the speculation has to be, again, the language is has to be, that uncertainty has to be charged to the government. So the court was wrong when the judge said, I find it incredulous that she would have testified. But this is specifically with respect to her individual counts, which should not have been in the indictment at all. It says should have been charged. The government should have had a word on this, right? But if it's not a credible claim, I don't know why you would pursue that. I'm sorry, did you mean that it's not a credible claim that she would have testified? You know, look, the rule of thumb, if you read all the white-collar stuff, is never have the criminal defendant testify because for whatever reason. Okay, that's probably, for the most part, good sense, and that's generally how it happens most of the time. But not always. And to say that it's not credible is to take it from the point of view of the trial judge. You come up with a theory as to why this was highly prejudicial. It altered the way in which the defense was presented significantly. A different theory altogether. Yes. That theory has to be at least somewhat plausible in order to credit your claim that that's how it would have been argued. Well, Judge, there are two things. The main thing would be, or not the main thing, but point one would be that if there's substantive evidence in the record that LaDonna was the, I use the term mastermind in the general sense. The government sort of makes fun of that. But if there's substantive evidence in the record that would have yielded, a whole different cross-examination of LaDonna, by the way, that she has the wherewithal to create her own independent fraud scheme. She would have done that. Pardon? She would have done that. Would have done that. In addition to that, there's the evidence that, again, when Sherry, when the search went down, Sherry is teaching in Las Vegas. LaDonna is sort of bragging to the undercover officer who comes in that she's running the show, whatever, so on and so forth. The implausible nature, again, you can't credit the district judges of the Supreme Court case law with respect to the standard. But this court has clearly adopted that. It's the hypothetical fact finder who hasn't already found guilt beyond a reasonable doubt. So it's this court looking at it that it's not so implausible to say this would have, again, raised that totally different defense. And two, at least let's work backwards. At least with respect to her own counts, with respect to her own tax returns, that weren't charged in the conspiracy and should have been severed out. It raises a weird question why they were in there. At minimum, it gives her an opportunity to get up there and testify about the four counts concerning her own tax returns, which she was hamstrung from doing now. She's going to take the stand. Now she can address those things. But on the larger thing, you've got these culpable taxpayers who, and the main thing or one of the big things are the blank receipts or the whiteout of receipts. I don't want to get my, I don't want the IRS coming after me. But every year we all drop off stuff at, you know, at the Goodwill or whatever, and nine times out of ten or 98 times out of 100, we receive a blank receipt. So it is. It's not a blank. It's itemized just as a dollar amount. No. Well, no. If you don't give them an itemized receipt, you're making money. No, no, no. The Goodwill, I don't know what. We understand your point. Well, I hope so, because I don't want to go out. The item is right there. I can't have those. But so the fact that filling in a blank receipt is suspicious in some general sense, but it is not, I can't retry the whole case standing right here. But there's enough uncertainty going on, and the focus would have been different to the point where it would have only taken, again, the standard I need to meet is, does it undermine the confidence that maybe one juror, again, a couple of the jurors already acquitted on some counts that I'm sure the government was upset about because it seems inconsistent with it. There was no Pinkerton instruction, to my recollection, so they couldn't utilize that. But there's some difficulty and inconsistencies going on with respect to the jury's verdict. I think consistent with the case law, consistent with a logical extension of PASHA, that it's not inconceivable under the standard that she might have testified and she might have also then the erosion of LaVonna's credibility would have had the jury say, look, we can't trust this. And plus you've got all these taxpayers out there who have been given walks under weird circumstances. That has undermined the confidence of everything. I know I'm at a... Briefly to switch it to a different subject. Okay, on the mistrial. That was not it. The 17th? Yes. Well, okay. Specifically this. Sure. What would you... The Seventh Circuit Schroder case is helpful. What would you have had the government do beyond what it did to determine the amounts that it could attribute to Sherry? Well, obviously it's their burden. I understand it's by a preponderance. But one that you need more than just a summary that at least with respect to some of that, the agent who testified didn't even fully understand what was the nature of what went into preparing the summaries. But the other thing is when the government is going to come up with these enormous calculations that they... It just seems that the preponderance standard can't simply be... And I understand in the case list that they can use summaries. There's the default 28%. But they made a blanket, essentially, calculation simply based on virtually no evidence. Do they need to call more? They're making an inference. They send out letters and they ask those from whom they receive no response. They infer that the entire deduction in question was inflated. It's fraudulent. Now, what should they have done to get you down below that 550? Well, they probably need to... Well, again, any time they're going to prove... And I know that the case law supports this, the guidelines support it, that they're not necessarily limited and they're certainly not limited to only what was provable at trial. I totally understand that. But that inference, I think they just need to do more. They at least need to do a selective audit of some of those. Okay, so some of them responded. And I'm not sure how specifically this is to the record, but assume that some responded and showed that... Invariably, it turned out that those who responded had deductions that Sherry had inflated, Sherry Andre had inflated. Now, the others who don't respond, as to those, is it not a fair inference that the pattern would have been the same? Judge, I don't think so because we're still dealing in a criminal case and non-response. If they can't do that, what should they do? Well, then... You're on the verge of a good case here, but I don't know what you're expecting from the government. They need to do... And I hope this is probably the best answer I can give today. They need to do something more than these essentially carte blanche or totally global inferences that is generally not permitted in any other areas of criminal law, and particularly with respect to this... So then you'd say they can't count the people who didn't respond? No, well, listen, the government... Listen, if this jacks up sentencing in this case, or they've got a lot of white-collar cases with regard to amount of losses that go enormous, and I'm not going to relitigate the whole point of the unfairness in some general sense of what the government proves a trial beyond a reasonable doubt, and then what they mushroom with respect to a higher guidelines calculation with respect to a much lower standard of sentencing. But it seems to me not unfair to tell the government that if they are going to put together, one, a case, what is proved at the case is proved at the case, and in the chart that we have in our report 5 brief, even with respect to what was proved beyond a reasonable doubt by actual testimony, I believe there's a... I don't know if it's a sample, but there's in some cases a significant difference between the amount of lost claims and what the actual trial testimony shows. That's really around the edge with respect to... Let's switch then to the DC procedure. Okay. What's your complaint about what DC did? Well, again, I just think that it's just... that they have to do more than what they did, and if people are not going to respond or if they're going to sort of do a carte blanche on saying that we're categorizing everything and taking an estimate, that the government, who has a lot of resources in this regard, just needs to do more, because otherwise there is... Well, the government sat down and interviewed 25 testifiers. The federal government. That's right. They did a lot. They interviewed 25 testifiers. They wrote an MOI on virtually all of them. Well, it just seems that... DC, I don't think, interviewed anyone. No, he did. That's my reflection as well. It just seems that the estimate provisions that are in the guidelines deal with a situation that seems to be like a loss in a fraud case is more ethereal in many respects than loss on a tax return, because ultimately, I guess this might be a judge, if the government wanted to, which I know it would take an enormous amount of time, with respect to each return, on the four corners of the return, there is, in fact, a number out there of a specific calculation based on several documents as to what was the inflated amount of tax return. They're sort of borrowing, I think, too far from the larger category of estimates in fraud cases, which sometimes really cannot be calculated. Like, how much did Enron cost people, whatever? That's a large... You can estimate in some sense, but it's incalculable. I think with respect to tax returns, that the court could at least come up with some direction for the district court to come up with some middle ground, more than what they did, it would be more fair to the defendant. Well, the extreme would be that they would have to audit each return. That would be the extreme. All right, so what's the middle ground? Sampling? Sampling? Sampling would be a possibility, something, though, more than... I mean, there are statistical models that I think are just more comprehensive. I think that would be a good term, than what was done here. Okay, thank you. Thank you very much, Your Honors. Good morning. This is the court. My name is Alex Robbins, appearing on behalf of the United States. And at the outset, I'd like to clear up two things that I think might make Professor Kerlin, my colleague, and Judge Ginsburg rest easier. The first is Professor Kerlin is doing nothing wrong by getting blank receipts from Goodwill every year. That is, in fact, the common practice. And the reason that they do that is because it's the duty of the taxpayer, not Goodwill, to report what you donated and the value of what was donated. The reason the Goodwill receipts came up in this case wasn't that there's anything wrong with blank Goodwill receipts. It was that Thomas J. Cox testified that he took Goodwill receipts that were, or I'm sorry, primarily, and that's receipts from different organizations. He took blank receipts to Sherry Davis's house, and he didn't fill those receipts out. So the government's argument was that he wasn't the one making up this $50,000, $45,000 figure for his donations that year. So that's the significance of the receipts. To Judge Ginsburg's point about sentencing, I want to clear something up. The issue with the correspondence audits where letters were sent by the tax authority to the taxpayer saying, you know, could you please document these, and they never responded or couldn't document it. Are you talking about D.C. or federal? Yes, Judge, and that's D.C. And we're not relying, in this appeal, on the D.C. tax laws. We are relying on the federal tax laws, and the federal tax laws get us to $645,000. I thought you were relying on both. I mean, you may be saying that you don't need to rely on both, but I thought you were. We're not arguing the correctness of the D.C. tax laws in this case. So you're fine if we just eliminate D.C. altogether? Correct, because it keeps us in the same guideline range, and there's no... And the defense argument... The defense argument is exclusively based on the guidelines. So that's putting up $5,500. It's still about $550,000. It's still about $550,000, which is the cutoff. It's $550,000 to $1.5 million under the 2015 guidelines, which I realize is a different issue, but it's in the same guidelines range. The defense isn't making no, like, 3553A1 or any kind of discretionary argument. It's just a guidelines argument, and to that extent, it makes no difference. And in fact, the federal tax law here wasn't based on correspondence audits. It was based on MLIs. So to the extent that... And based on... A memorandum of interviews. To the extent that we're looking for a middle ground here between an official IRS audit on one hand and sending out letters to people on the other, we have that in this case. So the ML... When you say MOI, the interview is the one that's conducted by the agent? Correct. The interviews were conducted by the IRS resident agent, and... And is that name... Of the 25 taxpayers. Correct. And those are the taxpayers that are listed in the sentencing chart for the government interviews that's sentencing. Primarily, it's the people who testified at trial. There are a few additional witnesses, and that's where the $642,000 figure comes from. All of those were based on memorandum of interview where someone from the government sat down with the taxpayer, asked the taxpayer about a return, and the taxpayer said, you know, these items aren't right. I didn't put those on there. The special agent who testified, as he testified, reviewed all of the memorandum of interview. All those memorandum of interview were turned over to the defense before the sentencing proceeding. That's where the radiation came from, actually. And then, I should say, the only exception to that is Sherry Davis did not have memorandum of interview. She was the defendant, so we relied on our proof of trial for that. So these were based on talking to the taxpayers and having the taxpayers say that this item is false. That's how we got to the federal tax law figure. What are we going to make of the notations regarding some of these entries that are per DOJ's instructions or I think in some cases there's no MOI? I think, Your Honor, the per DOJ instructions, well, let me back up. That document was not a document the government relied on in sentencing. It was not a document the special agent who testified had ever seen before. It's not in the record from either side what the document is, other than it was... This document was submitted by the government with a sentencing number. It was... Did it somehow leave the record after that? What is in the record, and I can tell you where the document actually came from, but I want to make clear that what is in the record from the district court proceedings is that this document was attached inadvertently to a filing at sentencing and it was not something that the testifying special agent had ever seen. That became clear. He was unable to defend... And I think he... The special agent quite probably instead of saying he knew something he didn't, answered the question truthfully. He has no idea what these things mean because he's never seen the document before. That's what I would say, too. I hope that someone... Now, when this first came before the district judge, he expressed a great deal of concern with what these notations meant. Correct. And so they would need to be explained. And the government... And the government explained them... And the government said, well, here's a clean version of the document that doesn't have these ambiguous notations. Again, for context, what actually happened was this was a draft document prepared well before the trial that the government erroneously attached to its sentencing filing, which is why some of them don't have MOIs and some of them are incomplete because it was prepared long before trial. I don't think the government said that in front of the district court. What the government said in front of the district court was this document was erroneously attached. The special agent has never seen it. If you look at the two documents, the tax loss on the real document is lower than the erroneously attached document. And on the real document, all the names there correspond to a memorandum of interview that by that point had been taken and the special agent had read and was able to testify about it. So the fact that the special agent had no idea what this draft document was that he had never seen before doesn't in any way undermine the government's evidence of sentencing. It's completely irrelevant, frankly. The problem is not limited to the inability of Naeem to explain the document. He probably couldn't do that, not having prepared it or even seen it. It's that the district judge was given, perhaps inadvertently, what is perhaps a penultimate draft that raises questions about the source of some of these numbers. It's particularly those that say based on preparer pattern. And the ones that say based on MOI have taken the case down. The ones that say per data instructions I would point out are LaDonna Davis and Sherry Davis. It's pretty obvious, I think, just from context why those say what they did. I don't know what it means to be based on the preparer pattern. The ones that say based on preparer pattern, a number of those don't appear in the final document. So those are out. The number of the individuals listed there, that's why the tax bill sticker goes down by about $25,000. The other ones had MOIs. There were MOIs prepared for those people. The special agent testified that there were MOIs prepared for those people, that he had read them, and those MOIs were produced to the defense, which is why the defense doesn't allege that there weren't MOIs. What the defense argument is is this is confusing, therefore, it fails Guideline 681.3. So just to be clear, I mean, are you saying that for every one of those it either wasn't relied on or there was an interview conducted? Yes. And those memorandum of interview were produced to the defense, and the special agent testified that he reviewed all the memorandum of interview, and that's the case. So that is what the tax loss figures were based on, which I think is why... Was it like Naeem again or someone else? Agent Naeem, special agent Naeem. And he, again, he didn't take the interviews. He reviewed them because he had also sat through the trial. So he had sat through the trial. He had seen the evidence. He had seen the witnesses testify. He also then reviewed the MOIs, and then at that point all the information was in one place, so then he testified at the hearing. But someone did the interviews. Correct. So they're not based on extrapolation. This is not extrapolation. This is not meta or sampling. This has nothing to do with sampling. And frankly, it has really... This extra document has nothing to do with anything because there's no dispute, I don't think, that if you take away the draft erroneously filed document that what the government did here in its sentencing proceeding is completely proper and is, in fact, normal. You talk to taxpayers. You take the evidence from trial plus any additional taxpayers where you can prove by preponderance that these figures were false and no one put on the return by Sherry Davis. And that's the tax laws used for sentencing. And that's how the agent got to the $642,000 figure that was the federal tax laws. And then that's what the record reflects. So we don't need to get to correspondence audits or DC tax laws or anything else to affirm the sentencing. We have the four or five places on the record where the district judge faced with the repudiated document raised questions about it. Is there any place on the record where he explains that those are no longer concerned? Well, the district judge's ultimate conclusion, I think, you know, not at any length. The district judge's conclusion after hearing both sides of it was I think the government has adequately set forth the tax laws in excess of $642,000 and then added the DC tax laws and assigned the guidelines level that way. But what you just described and told us, we can find that in the record? In the sentencing hearing, yes. The sentencing hearing is, as far as I'm aware, the only place in the record where this comes up and is then explained. And again, because I don't believe the prosecutors were aware of the erroneously attached document until this was brought up in the sentencing hearing, it all happens relatively fast in terms of what the explanations are and what's happening. But really what happened here is, and I don't mean to say it was improper. The government had a prima facie case by compliance with the events of the tax laws. The defense found a document that kind of resembled the actual document being used that the testifying agent didn't know anything about and created some confusion by asking questions that he was unable to answer and then left it at that. They haven't gone any further. That doesn't, as a matter of law, undermine the sentencing proceeding. As a matter of just common sense, it doesn't either given what this document was. It's just a prior draft. Can I ask you a different question about sentencing, which is a small amount relative to what we've been talking about, but just Andre's objection to the roughly $4,000 restitutionary award predicated on the false tax returns filed by Sherry. Yes, John. What's the government's theory for how Andre can be held responsible for Sherry's own tax returns? Because, well, two theories. First of all, Sherry's own tax returns are part of the charge conspiracy. So even under Huey, the case saying the restitution is generally based on counts of conviction. And you're making that on the way the indictment's framed? On the way the indictment's framed. The second argument would be... I don't agree with you on that. The second argument would be under the NDRA, the Mandatory Victims of Restitution Act, 3663A, I think, that we cite in our brief, when you're dealing with a crime that's a scheme or pattern or conspiracy, restitution is not limited to the offense of conviction. In other words, when you're dealing with a... But it has to be limited in some way. I mean, it can't be... It has to be relevant conduct. So normally restitution is more limited than relevant conduct. You can get relevant conduct for, you know, in a case like this, for all kinds of additional false returns that weren't charged. You can't get restitution for those. You don't get restitution for the offenses of conviction. After the Supreme Court's decision in Huey, Congress amended the restitution statute to allow for restitution beyond the offense of conviction in cases involving a scheme, pattern... Right. But I guess there has to be some nexus. There has to be... There has to be some nexus to something that Andre did. Absolutely. He was working for a criminal enterprise. I mean, he was part of the conspiracy because he was working for a tax preparation business that files almost exclusively false returns. That's what they did. The testimony wasn't just with John Davis. Dwendalyn Hart-Walk also worked there and testified. The job of what Sherry's tax return preparation business did was take people who had withholding and get all of their withholding back. So if he's working for... If he's part of a common scheme for a month and then Sherry files a false tax return that he has no idea about that's for $10 million, has nothing to do with him at all in terms of his own conduct and knowledge, that he can be hit with a restitutionary award for the $10 million? So like a temporal argument that... I don't believe the defense has made that argument. I think the temporal argument that he's only on the hook for the loss for when he was part of the conspiracy, in this case it doesn't matter because the $4,000 reflects Sherry's unreported receipts for the time period when Andre was part of the conspiracy. I guess I'm just... The temporal overlap is just maybe the easiest way to exhibit what seems to be a pretty breathtaking scope of causation that's asserted by the government, which is that if one defendant just has nothing to do with part of another defendant's conduct, even though they're both conceivably involved in some joint enterprise, has nothing to do with that at all, as a matter of restitution, defendant A can be responsible for something that was based on the conduct independently of defendant B. I think the nexus is closer than the premise of your question suggests because, first of all, we do have temporal overlap, so that part's clear. It's not like this is some sort of... It's a drug case, for example, where a lower-level person in the drug gang is on the hook for the unpaid income taxes of the kingpin of the drug gang. I think that would be closer to the borderline of what you're talking about, Director Nivasan. This is a case where the entire purpose of this business was to file false tax returns. They did it for clients, and they did it... Sherry did it for herself. And LaDonna, after Sherry taught her how to in 2006, did it for herself. What she did independently was not part of the business. That's all I'm getting. Is there no foreseeability requirement? I disagree. It is part of the business because she's preparing her own return sitting at the computer while she's preparing everyone else's returns. She goes up into another room and prepares it. The business is to prepare these returns for clients. Sure. Sherry's not a client. She's an owner of the business. I just wonder. I think if we're talking... We're talking about restitution, and we're dealing with what is the minimum acceptable nexus under the NBRA for restitution, which generally tracks relevant conduct, whereas under Huey, restitution is more limited. Once your restitution calculation gets close to relevant conduct, I think this is well within the relevant conduct concept, I understand, for restitution, because this is a business... This is a conspiracy whose purpose is to get money from the government by defrauding the government by filing false tax returns. And this is a species of that. I agree it would be a harder case if it were a drug gang or something like that. And again, I don't think that this particular version of the argument is something that I understood the defense would be making. I think it's a stronger argument than what they're making. I think ultimately it fails because of the NBRA and the statutory provision of how restitution works when you're dealing with a scheme or conspiracy or a pattern. To address, if I might, the Brady issue, I think the problem... Sherry Davis would have a much stronger case here if the theory of the government's case, or if what actually happened was she was an absentee owner, that she was off at Las Vegas, not just when the search was executed, but while all this criminal conduct was going on, and if LaDonna was there for the whole time period of the conspiracy. Because then you would have more of a type of case where you have an underling who's saying, well, yeah, I didn't really do it, pointing up to my boss, who's the bad guy, and then boss says, well, no, it wasn't me at all. The underling is running the side fraudulent tax preparation business, and I was off in Las Vegas, and I have no idea what's going on. That's not the case. Every witness who testified in the chart on pages 12 and 13 of our brief identified Sherry Davis as being there  at least one of the years. Usually most or all of the years. Sherry Davis was physically present in her house preparing these witnesses' tax returns. And the conspiracy continues for two years after LaDonna Davis, the potential purported mastermind, or at least person with the wherewithal to commit a tax fraud scheme, leaves the conspiracy. So that is his case. The conspiracy kept going just fine without LaDonna Davis there, and Sherry Davis was physically present. This is not a case where we're trying to, you know, get someone who's not around on the hook based on accomplice testimony. I also think it's wrong, that Professor Kerlin is wrong when he argues that without LaDonna, the sort of scheme goes away because then there's no conspirator. In other words, if there's no Andre, Andre gets acquitted, and he's not in the conspiracy, and LaDonna's not in, there's no conspiracy at all. I think that's the wrong way to look at the evidence. What we have is a criminal enterprise that's treading along nicely, and then a potential purported key player, LaDonna, leaves, and the criminal enterprise keeps moving along. That fact is circumstantial, very strong circumstantial evidence that she wasn't really a key player at all, and that in the time period before she was there, the criminal enterprise basically was functioning the same way. So you can't just separate the two, you know, it's similar to, you know, someone walks out of a department store, and the alarm goes off. If they run, well, that's indicative of guilt, and if they come back and say, oops, sorry, I don't know, I had this in my bag, I think that's indicative that maybe they innocently walked out. The fact that LaDonna leaves, and the conspiracy keeps going, is evidence of the conspiracy's existence, not just after LaDonna left, but before LaDonna left. So I think that's my response to that particular question. So the rest was predated her arrival, right? The conspiracy as charged did not predate her arrival, because she started living with Sherry Davis in 2004. The charge of conspiracy begins in 2006. So she's already living there when it started. Was there a false return spot before she arrived? Arrived, I mean, she's living in the house. Before she takes any active part in the conspiracy. I'm not sure that's correct, because I think she was involved as early as 2006, and that's the beginning of the conspiracy time period. I could be wrong about that. I don't know that the defense has made an issue of it. I do think that, I mean, she's physically present in the house. She admits to, or she testifies, she stated, and this is a Brady issue, she stated that Sherry prepared her 2006 return, taught her how to do it falsely, and then thereafter for 7, 8, 9, 10, she did it herself based on what Sherry taught her to do. So we have her, at the very least, in 2007, preparing false tax returns, and I believe in our chart we have her for the 2006 tax year, which would have been early 2007, preparing false tax returns. So I think she's there from the beginning, and then it's Andre, she leaves, and Andre comes at roughly the same time in 2011. Andre comes back from college around the time she leaves  ultimately leading to her cooperation agreement in place. I think that this is a recap of our Brady argument. The defense, I think, is not emphasizing the Giglio, that is Brady impeachment side of the argument correctly because 5 returns versus thousands that she testified to filing is not a significant difference in terms of how untrustworthy this particular person is. The exculpatory prong of the argument, again, just isn't consistent with the record. It doesn't make sense in this case because the controversy kept going after she left, because she was clearly not a mastermind, because she, I mean, primarily those two, but this is not a case where she was the key player. With respect to Andre's sentencing arguments, and I'm happy to address anything particular that the court wants me to, but I think just the idea that a signature by itself is meaningless, first of all, is not true. A signature is circumstantial evidence that a particular person signed something. That's just common sense. But a number of times my colleague was up here arguing that, you know, the E-FIN application alone is useless, I think she said. The electronic signature alone is useless. This is not a case where we're relying on just one thing. This is a circumstantial case where we're relying on the fact that Andre Davis has his name as the electronic signature on the 2012 Jaycox return. Jaycox testified, notwithstanding the defense arguments, that Andre prepared his return. At the very least, the young man who worked there prepared his return. The defense of another young man? There was one witness, Mario Little, mentioned Adam Russell, who was typing numbers into a computer, according to Mr. Little, that Andre Davis told him to. That's the only mention of any other man who even appeared to work there, and it's sort of a stray part of the record. Well, but the answer to the judge's question is yes. I'm sorry. I thought it was an open-ended question. I didn't get to question you on it. There was another young man. That's another man who's a young man. There was another young man who, according to one witness, was there, Adam Russell. And he was young? He was young. I mean, that's not in the record, I don't think. As a factual matter, he was young. He also didn't work there. But there is a stray reference in the record to a young man not working there but playing with a computer, basically putting in the numbers that Andre Davis told him to. And the record also says he was a family friend. Now, what's telling here is that this is not an argument. This is an argument that was available to the defense at trial. It's not an argument they made to the jury. This is not a new argument. The argument the defense counsel who sat through the trial made was, you can't believe Jay Cox because he's lying, because he's guilty too, he just wants immunity, he's afraid of the government, and he's lying. That's the argument they made at closing. There was no Adam Russell theory made at closing, and it's an argument that was perfectly available to them. The reason they didn't make it is because there's scant support for it and it would have been rejected for not making any sense. So I think the defense made the best argument they had available to them at trial, and they won some of them. On Andre's count, they won two of the three of the false friend counts, and they lost one of them. And that's exactly, I mean, what juries are supposed to be doing, is listening to everyone and seeing them and sorting, you know, guilty counts. So two questions you heard me ask about count 19 in light of count 15 and also the closing argument as to the 2.1 dollar statement. Yes, yes. Count 19 and 15. I believe that was your first question, so I'm going to rasp my brain a little bit. Sufficiency of the evidence. All right. And the district court granted the motion to dismiss count 15, saying it wasn't enough to have evidence that somebody was sitting at a computer. Then as to count 19, the argument is made that there's no evidence, again, it's a temporal point, that the figures were entered by Andre or that he knew that the figures entered were false. That's incorrect. The evidence, Thomas Jaycox testified that Andre prepared his return and Sherry came by to finish it up or finalize it. No, but what I'm trying to get at is the argument is that Jaycox on, what was it, cross-examination withdrew his identification of Andre, said if you bumped into him on the street, he wouldn't know who he was. So he referred to a young man. So the question is if it's a young man or if it's Sherry, is it enough to convict Andre of the count 19 charge? I think there are two different components. There are two different potential defense arguments in your question, Your Honor. The first is Andre versus some young man. And the very least defense counsel agrees that Mr. Jaycox did identify a young man. He also identified Andre Davis. They think he repudiated that. We think his testimony is inconsistent. Let me just say, suppose the court takes his cross-examination testimony, which is not just one question, one answer, as what the evidence was in terms of the government meeting its burden of proof. Then what do you have? The difference between count 15 and count 19 is not anything about a young man or the sufficiency of the identification. No, it's a knowledge issue. No, I don't think it is. I think it's the access rights issue. All right, who did it? Right. And the question is what's the evidence to show Andre did it? The evidence is, I don't think that's in dispute. The evidence is that the young man prepared the return. Their issue is one of identification. I can explain that count 15 is a very different issue than what we have in count 19. I just gave it as an example of the district court understanding it wouldn't be enough to just say the guy was sitting at the computer entering numbers. That was an access rights holding. What the district court said with count 15 was the mere fact that Andre was there and his name did appear on the return, which is probably why Sherry was acquitted of the same count. The district court then ruled 29 as Andre because the witness' testimony was not that Andre did anything. He was just there. Mr. J. Cox's testimony was that Andre and or the young man prepared his return. That's an access rights issue. The defense argument is maybe it was Andre, maybe it was somebody else. But if the evidence is somebody prepared my return, it may have been the defendant or it may have been someone else. Then on cross-examination, I say even though I earlier testified that it was the defendant and I was sitting across from him, but I wouldn't know him if I saw him in the street. Is that proof beyond a reasonable doubt? That's what I'm trying to get you to focus on. Yes, because the identification is simply one piece of evidence. It's a brick in the wall of the evidence against Andre. So, yes, it is. And what do you think your burden is? Beyond a reasonable doubt. Here? Yeah. I mean, counsel, that's too facile. I mean, the burden below is proof beyond a reasonable doubt. The burden here is Jack Henry Virginia. For sufficiency of the evidence, what did the government have to show for count 19? I thought it was, and maybe I'm wrong, and it had to have evidence from what a reasonable jury could find that Andre entered the false numbers or approved the return that had the false numbers knowing they were false. Yes, that's right. And the evidence was that the young man who prepared, let's just take the defense theory for a second. The evidence was that the young man who prepared Mr. J. Cox's return prepared it, sat at a table with him and entered numbers for the 2012 year, and then Sherry came by to look it over or finalize it, and then it was signed and filed. So how could the jury find, based on the evidence before it, that Andre is the one who entered the false numbers as opposed to Sherry? That's all I'm trying to understand. Oh, and I apologize, Your Honor, for being vague. Because Sherry comes over, finalizes the return, and we're not clear on the timing, et cetera. That's all I'm trying to understand. Oh, I see, Your Honor. And I apologize for not getting to your point earlier. They both, we charged them with, because we believed, that they both filed the false return. But the government believed in them. No, no, I understand. We had to prove it. The jury acquitted Sherry on J. Cox's return, presumably because her name was on it. You can't speculate as to what the jury found. The question is, what was your evidence that Andre either entered the false numbers or knew they were false and approved the return? That's all I'm asking. Andre knowingly joined a criminal organization that did nothing but file false tax returns all day for years. He was warned about it by LaDonna Davis and was dismissive of it and said, it's not a big deal, she's going to go away, in reference to the criminal investigation. He helped his mother, who had been kicked out of the electronic filing program by the IRS a few months earlier. He used his name to sign her up for the electronic filing program again, which, contrary, I think, to the defense argument, would itself be fraud, because it was followed by a conspiracy charge, and then he began preparing returns with her. Most of what you just said there has to do with the conspiracy conviction. I thought what Judge Rogers was asking about was the filing of the false return for the 2012, and after that, I thought that the evidence is J. Cox's testimony. It depends on how you characterize his testimony, and if his testimony to the effect that he prepared my return is enough, it's enough. If it's not, it's not. I agree. I know what I'm attempting to respond to Judge Rogers' question, saying that's not all we have, because to the extent that there is ambiguity in Thomas J. Cox's testimony, it has to be evaluated in light of the overall conspiracy. Obviously, being involved in a criminal conspiracy whose goal is to file false tax returns makes it more likely on any given point in time, on any given day, that you knowingly filed a false tax return. Well, I think the problem with the plus part, I'm not saying if you take out the plus part, it's not enough, but it seems to me one problem with the plus part is, as to this count, one of them did it. That's what the jury thought. So then the question becomes which, and I think Andre's argument is that it wasn't me. I didn't know anything to do with it. If it's false, Sherry was the one who did it. So the fact that they're both involved in a conspiracy together, which is all the Moore stuff, doesn't really help you as to that because, yeah, they're both involved in the conspiracy, but as to this count with respect to the false 2012 tax return for J. Cox, it's just a dispute about which one of them is the one that's responsible for the falsity. I'm not sure it's that mutually exclusive. I think the jury appears to have believed it was based on what we see from the commissions, but two people can prepare a false tax return knowingly. Sure. I think in this case, yeah, it was a who did it, and it was to the jury to decide who did it, and the jury decided that Andre did it based on listening to Thomas J. Cox testify for a day. It comes down to J. Cox's testimony. It comes down to J. Cox's testimony as to the identity and the act of friars. I think that because Judge Rogers was asking more generally about knowledge, I think the conspiracy and the existence, the proved existence of the conspiracy is very good evidence of knowledge, and I think my opposing counsel said something at the beginning, you know, agreeing with that, that, you know, the conspiracy charge and the false return charge are going to, in other words, if there's a false return, there's going to be a conspiracy because the knowledge elements overlap for those. The question here is the specific act of friars for this tax return, and that was based on Judge, that was based on Thomas J. Cox's testimony, as Judge Renabowski pointed out. So I think that's our case on Mr. Davis. J. Cox's testimony that he sat down with the young man who went through this process, but he wouldn't know Andre if he bumped into him. It seems to suggest that there was someone other than him. And I think that's, I mean, I think the defense is over-reading that line, he wouldn't know him if he bumped into him on the street. There are plenty of people that I could say that I've met or interacted with that I might not recognize if I bumped into them on the street. They're just different standards. He didn't say, you know, I don't remember who it was. He didn't say I have, like, no idea what the guy looks like. He said he wouldn't recognize him if he bumped into him on the street. Again, that's true for professors I've had in law school. I can say I had this professor in law school. I wouldn't necessarily know him if I bumped into him on the street. I wouldn't recognize him right away. He didn't know him. Well, the testimony from J. Cox was he knew Sherry, and he had seen Andre, and he identified Andre. And when he was cross-examined about it, in the testimony that the defense points to in their opening brief, they point to the line of saying, based on the name and the return, and then he gets interrupted. And then the next page is the part we quote in our brief where he says, what I'm saying is, I'm not sure it's 2012. I need to see the name and the return to know which year Andre prepared my return. So I think that Andre's testimony is, I'm sorry, J. Cox's testimony is more certain than the defense suggests. At the very least, it's inconsistent, and the jury watched this gentleman testify for the better part of a day and convicted Andre on this count when it acquitted him on two other counts. In sum, if there are no further questions, Your Honor, we think the defendants in this case were properly convicted and sentenced, and we ask this court to affirm. Thank you. Court, with indulgement, I do have quite a few things I want to touch on. As to the sufficiency, to be clear, you know, I want to be clear about this, it's just the entry of a preparer ID number. That's all it is. And regarding the framing issue, the idea that Sherry, that it would be unlikely that Sherry would leave his name on there, I just want to say that she obviously wasn't worried about having her name all over these things, and LaDonna said that Sherry didn't switch out the preparer ID when she went in and made entries as she did here. That's the important thing I don't think the government mentioned. It's not just that she came in and finalized it, but she actually put information in. The government agrees that it was fine for Jay Cox to bring in these ambo receipts, so there's no inference from that that it would get under any intent. Saying the young man went over the return is not enough, given the timing. I think we talked about that. As far as him saying that the defense argument was different below, that's, of course, obviously completely irrelevant to what the evidence was sufficient. It doesn't have anything to do with it. The strategy that was chosen when you're in a joint trial doesn't have anything to do with anything. Also, the withdrawal of the ID was not on cross, it was actually on redirect. It's not as if he was tricked into somehow backing down. The government maybe should have become obvious on cross, but it didn't, and then the government elicited on redirect that really it was a young man and you don't really recognize the defendant, so I want to make that point. I want to also be clear that the government can't say that the Jay Cox stuff makes the conspiracy and the conspiracy makes the Jay Cox stuff. I mean, there's no other evidence of conspiracy. He cannot be convicted of conspiracy if he has no connection to any false or knowledge of any false returns. I hope I'm clear about that. Regarding the closing errors, you know, the error, you can't say that the error must not be plain if the defense counsel didn't notice it, because that's always the case, obviously. All I can say is it's brief and it was obviously false and should have been caught, and the case was hanging by a thread if it was sufficient. The sentencing, I'd like to say that about Huey, I think the government is totally misunderstanding this relevant conduct thing. I really want to clear that up, because the extensive 3663 saying relevant conduct, 4443 is not relevant conduct of the conspiracy, even to Sherry. Sherry's held responsible for that because of her substantive count. The conspiracy does not cover, count 12 does not cover Sherry's conduct. Sherry's conduct is count 34 to 36 or whatever. So it's not even relevant conduct for Sherry in the conspiracy, and it could only be relevant conduct for Mr., even if it was, it could only be relevant conduct for Mr. Davis if it was within the scope of his agreement within the conspiracy and foreseeable to him. But it's not even relevant conduct for Sherry. So what 3663 is really saying, 3663 is about a situation where someone pleads to one count of mail fraud and there's a scheme, and all the other victims who weren't in that count are getting, not getting any money back. And so they said if there's a scheme that has an element of scheme, then what it says is, the government quotes it, that the, that you get the, a victim is defined as, the defining victim. Victim is defined as someone who is harmed as a result of the defendant's criminal conduct. So it's just really inapplicable here. The United States, we already know the United States is the victim, and this conduct that was done by Sherry was not the defendant's conduct. So there's no way that 4443, which was fully preserved, can possibly be affirmed. The two preparer pattern people that were very clearly challenged by defense counsel below, Williams and Deborah Johnson, the point of that is, that the preparer pattern information was inconsistent with what the agent said. The judge did not know this out-of-record information that the counsel is bringing out now and saying this was an earlier draft. Well, I just, I asked him about that, and he said if I read the sentencing hearing completely, I will see this is all explained to the district court. I'm sorry, I couldn't. As I understood the counsel's response to my question, all of this was explained to the district court at the sentencing hearing, and I would see that if I read the complete sentencing hearing transcript. Well, I don't think it was explained that it was, had actually been superseded, you know, by. Well, did the district court understand that? I thought that was the thrust of judge. I did not see that. That does not sound right to me. So you think the district court was proceeding on the basis of the inadvertently filed document? I think he kept asking what does this mean, what does this mean, and the government didn't tell him, and then in the end he just said, you know, I'm going to go with the agent's testimony. And, you know, if that document hadn't been there, the agent's testimony would have been sort of a black box. We wouldn't really understand how the agent got his numbers, but he would have said, trust me, I asked about the credit, I asked, you know, what the number is, and we did it, and this is what we got, and that would probably be okay. No, but you heard counsel. He said that what the district court finally had before it was a statement based on the interviews, the reports, the memorandum on the interview and the trial testimony. Well, but the two people were challenging. They don't, it says prepare a pattern, and I guess I did make this point. I just would like to say that the prepare a pattern, it doesn't make any sense because you can't solve, you can't figure out. So prepare a pattern is still on the final document? No. That's my point. Yeah. It's not, but the judge doesn't understand. I don't, my reading of the transcript is that it's not clarified for the judge. It's not cleared up, and unless the prepare a pattern is we always triple the real donations or we always add a zero to the real donations, it makes no sense to say that you could possibly figure out what the credit is. So it just, and I think Naeem did not try to explain how that was consistent at all. We would ask the court to vacate both counts of Mr. Davis' conviction, dismiss the case, and then the alternate order a new trial, and then the alternative grant him a resentencing with both loss and a restitution to be no greater than the loss that he was attributed to, minus Sherry's personal return and minus Deborah Johnson and Thomas Wayne's loss. Thank you. Your Honors, very briefly, the first thing with respect to the sanity in the above $550,000, in light of the government's concession, which I think they actually also conceded in their brief, so that wasn't new, the, Sherry needs a resentencing anyway, because even assuming, a point that I'm not going to concede right now, that the proper calculation, because I believe if that stuff is before the court, they might deal with some other issues as well. But even with respect to the government's concession, the total amount of loss, even if it's above $550,000, affects the judge's sentencing. Judge Hogan already departed in the original sentencing for a variety of other factors. But if the amount of loss comes down, if the DC sub is taken out, at minimum there needs to be a remand for resentencing. But the recognition, I would assume that, one, the lower number, Judge Hogan can depart if he wants to. The other thing is, is that if it turns out with respect to some other factors, which has been argued in the brief, if the number comes down, there's going to be even more issues with respect to prepare a pattern. I don't think the government is going to, oh, I don't want to assume, but if the calculation at a resentencing goes below $550,000, I don't believe that Judge Hogan is going to enter an illegal sentence, based on some purported waiver as to how the issues were preserved below. But in any event, at minimum, knocking out the DC calculation numbers, and even if it is above $550,000, that would still give the grounds for a new resentencing and the ability for Judge Hogan to take everything into account. And so this is the departure argument? No, I'm simply saying that with regard to if it turns out, and I'm not conceding this, but if it turns out that even with the government's concession that the amount is still above $550,000, that's still several hundred thousand dollars below what the original amount of loss was in the first thing. But why does this matter? You're still in the same trounce for making a base offense. Well, no, but I was simply just pointing out that I believe that Judge Hogan, for a variety of other reasons, departed downward a lower number, even within that range, $550,000 to $1.4 million or something like that, that it's, judges could still, I mean the trial judge might still feel that with that lower number. So if it's $551,000? Yes. Okay. The other point that I just want to make very briefly has to do with some of the statements that the government made concerning the scope of the conspiracy, and then with this Adam Russell, the one line in the transcript. The government, in closing, argues this, and this is on page 1303 in the joint appendix, and the elements for conspiracy in an abridged fashion are the defendant agreed with at least one other person to defraud the United States. This defendant, Sherry Davis, agreed first with LaDonna Davis and then her son after LaDonna pled guilty. Sherry Davis and LaDonna Davis agreed, and then Sherry Davis and her son agreed. And that's on 1303 and 1304 in the joint transcript. Just so there is no misunderstanding, and I'm not 100% sure that's what the government was arguing, but when I was listening to the government's argument, any suggestion that the record demonstrates that there was another co-conspirator, known or unknown, is patently not supported by the record and was not the way the government argued the case. So, with respect to the way that the government tried to sort of reconfigure conspiracy law, the conspiracy, in this case, is a specific charge that deals with manner and means to deal with false penalties and false charitable contributions. The way the government argued it here was that, well, it's conspiracy to defraud the government by filing fake information all over the place and ripping off the government. That isn't the charge. So, they need, so when the court is evaluating the evidence with respect to, if Andre is brought back for legal insufficiency, then there is no conspiracy after LaDonna leaves the conspiracy as a matter of law. And the point that I was making, or tried to make, both in the briefing and in my initial argument, the government sort of changed. This isn't a legal sufficiency argument. We all know that. The point is that with respect to that first half of the conspiracy, the underlying attack on LaDonna's credibility and the additional possibility that the statement that LaDonna prepared her original 2006 return is a controverted issue. The government's representation that it isn't is not the case. If that could have come in as substantive evidence based on the Brady violation, that, in addition to the additional erosion of her plain old credibility, hits the Brady standard and the standard set forth in PASHA, that the confidence in the conspiracy verdict is gone. Now, what does that leave? It might leave, and I'm not suggesting that it does, it might leave a bunch of independent 7206 charges against Sherry and perhaps against, but that is a whole different ballgame. And on that particular ground, the court would then have to look to, is the erosion of the conspiracy charge so sufficient, so comprehensive, that it creates a situation where, well, you know what, LaDonna might, excuse me, Sherry might have testified, and we do not have confidence in any of the verdicts. And I think if the court, when they're evaluating, when the panel is evaluating it, if the court gets to the point where the conspiracy verdict is in question, and the decision is made that under Brady that has to go, the court then also really needs to, as a practical matter, step back and say, doesn't that also sort of unravel everything? And the fact remains, and the government didn't argue otherwise and didn't contend the point, this case could not go forward without LaDonna's cooperation. And so if LaDonna's credibility and her ability to be further eroded with respect to substantive evidence that could have come in that indicated that she did file a 2006 tax return, she created the entirely independent fraud scheme with regard to dependents. If the conspiracy charges eroded, I think the court has to look at Posh and say, you know what, that probably does raise a sufficient question concerning the integrity of the verdict on all counts. Your Honors, thank you very much. Thank you, and thank you, Professor, on behalf of the court, for your assistance in this appeal. Thank you very much. It's always an honor to accept the appointment. Thank you very much. We will take a brief recess.
judges: Rogers, Srinivasan, Ginsburg